UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROGER KNOX,<br><br>Defendant. | Criminal No. 18cr 10385<br><br>Violation(s):<br><br>Count One: Conspiracy to Commit Securities Fraud<br>(18 U.S.C. § 371)<br><br>Count Two: Securities Fraud; Aiding and Abetting<br>(15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment:

General Allegations

Key Individuals and Entities

1. The defendant, ROGER KNOX ("KNOX"), was a resident of France.

2. Co-Conspirator 1 ("CC-1") was a resident of France who worked with KNOX.

3. Co-Conspirator 2 ("CC-2") was a resident of Los Angeles, California who invested in publicly traded companies and engaged in pump-and-dump schemes as well as other forms of market manipulation.

4. Silverton SA, also known as Wintercap SA ("Silverton"), was a purported asset management firm located in Switzerland that was owned and operated by KNOX and CC-1.

5. Brokerage 1 was a brokerage firm located in Malta.

6. Brokerage 2 was a brokerage firm located in the United Kingdom.

7. Brokerage 3 was a brokerage firm located in the United States.

8. Environmental Packaging Technologies Holdings, Inc. was a Nevada corporation that began trading on the over-the-counter ("OTC") securities market in or about June 2017 under the ticker symbol EPTI.

9. Cure Pharmaceuticals was a Nevada corporation that began trading on the OTC securities market in or about November 2016 under the ticker symbol CURR.

10. EPTI and CURR were controlled by CC-2, together with others.

11. The United States Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government. The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder. Among other things, federal securities laws are designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

Key Terms and General Background

12. Shares, or "securities," of publicly traded companies (known as "issuers") that are acquired directly from the issuers, and are not registered with the SEC, generally cannot be sold to the public. Such shares are considered "restricted," and bear a legend indicating that fact on their face. Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "free-trading," and may be bought and sold in the public market.

13. "Penny" or "microcap" stocks are securities issued by small, publicly traded companies that typically trade at less than $5 per share, and often less than $1 per share. Penny stocks typically are not listed on organized securities exchanges such as the New York Stock Exchange or NASDAQ Stock Market, but rather are traded on the over-the-counter ("OTC") market. Such stocks are particularly susceptible to manipulative trading and other forms of fraud because, among other things, they are often thinly traded and their free-trading shares may be controlled by a single individual or group of individuals (often called a "control group") through third party or "nominee" shareholders.

14. A reverse merger is a transaction in which a privately held company acquires a publicly traded company, and thereby itself becomes publicly traded without going through an initial public stock offering. Often, the publicly traded companies involved in reverse mergers are "shell" companies with few, if any, assets or operations.

15. A "pump-and-dump" scheme typically involves the artificial inflation of the stock price and/or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's "float," or free-trading stock can profit by secretly selling their shares to other investors (the "dump").

16. Generally, pump-and-dump schemes effect the artificial inflation of stock prices through, among other things, the issuance of news releases and promotional materials—often containing false, misleading, or exaggerated claims about the companies' potential, or predicting unrealistic stock price targets—and through manipulative trading designed to generate the appearance of demand for the shares. Such schemes often rely on paid promotional campaigns to disseminate false and misleading information through emails, newsletters, hard mailers and social media outlets.

17. An "affiliate" of a publicly traded company is an entity or person—such as an executive, director or large shareholder—who, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer. Entities or persons holding more than 10 percent of an issuer's stock are generally deemed to be affiliates. Affiliates must register their shares with the SEC before selling them, unless there is an applicable exemption from registration. In the context of OTC securities, affiliates are not permitted to sell more than one percent of an issuer's total outstanding shares in any three-month period.

18. SEC regulations require certain public companies, and their investors, to disclose any ownership interests in excess of 5 percent of the companies' stock.

## The Conspiracy

19. In or about and between 2013 and October 2018, KNOX conspired with CC-1, CC-2, and others known and unknown to the Grand Jury to commit securities fraud by disguising the ownership and control of various microcap securities so that, among other things, the control groups and KNOX could engage in pump-and-dump schemes and other forms of market manipulation.

## Object of the Conspiracy

20. A principal purpose and object of the conspiracy was for KNOX and his co-conspirators to make money by selling securities in microcap companies at in a more liquid market and/or at artificially inflated prices.

21. Another purpose and object of the conspiracy was for KNOX and his co-conspirators to conceal their actions from regulators, law enforcement and investors.

## Manner and Means of the Conspiracy

22. Among the manner and means by which the defendant KNOX and co-conspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

   a. Distributing free-trading shares of various microcap companies among several nominee shareholders to disguise the fact that the shares were controlled by a single control person or control group;

   b. Transferring the shares from the nominee entities to Silverton, and then to omnibus brokerage accounts in Silverton's name;

   c. Engaging in promotional campaigns and manipulative trading to artificially boost the securities' share price and trading volume;

   d. Selling the shares from the Silverton omnibus accounts during the promotional campaigns, without required disclosures and in violation of federal securities laws and regulations governing the sale of stock by affiliates and other investors; and

   e. Remitting the proceeds from the stock sales to the control person or control group and their associates.

## Overt Acts

23. On or about various dates between 2013 and October 2018, the defendant KNOX and his co-conspirators committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

   A. The EPTI Pump-and-Dump

24. In or around August 2013, CC-2, together with others (collectively, the "CC-2 Control Group"), acquired the majority of the shares of a publicly traded company with minimal assets and operations (the "EPTI Public Shell").

5

25.     Beginning in or about May 2015 and continuing through 2017, the CC-2 Control Group distributed its free-trading shares in the EPTI Public Shell among four offshore entities that were created to hold the shares (collectively, the "EPTI Nominees"). The EPTI Nominees, in turn, were registered in the names of various third party "beneficial owners" with familial or personal connections to the CC-2 Control Group.

26.     In or about and between December 2016 and June 2017, CC-2, together with others, merged a privately held company, Environmental Packaging Technology, Inc., into the EPTI Public Shell. The reverse merger closed on or about June 9, 2017.

27.     In or about April 2017, the CC-2 Control Group caused the shares held in the names of the EPTI Nominees to be transferred to Silverton. At the time of the transfer of shares, each of the EPTI Nominees held under 5 percent of the company's total outstanding shares.

28.     In or about and between April and May 2017, KNOX caused the shares to be deposited into Silverton's omnibus accounts at multiple brokerage firms. For example:

   a. On or about April 12, 2017, KNOX caused Silverton to deposit approximately 2.7 million shares of the CC-2 Control Group's shares with Brokerage 1;

   b. On or about April 27, ~~2012~~2017, KNOX caused Silverton to deposit approximately 2.6 million shares of the CC-2 Control Group's shares with Brokerage 2; and

   c. On or about May 3, 2017, KNOX caused Silverton to deposit approximately 2.6 million shares of the CC-2 Control Group's shares with Brokerage 3.

29.     In or about and between April and May 2017—before the merger of the privately held company Environmental Packaging Technologies, Inc. into the EPTI Public Shell had closed—CC-2 and others raised approximately $2.9 million in a private placement of shares of Environmental Packaging Technologies, Inc.

30. In or about and between May 20 and May 25, 2017, CC-2 and others transferred approximately $1 million of the funds raised during the private placement to another offshore entity, Svarna Ltd., that was created by KNOX.

31. Thereafter, KNOX and CC-1 transferred the $1 million from Svarna to a third-party stock promoter that the CC-2 Control Group had hired to promote the shares of EPTI.

32. On or about June 12, 2017, the promoter began touting the shares of EPTI to U.S. investors, including investors in the District of Massachusetts, prompting a significant increase in the stock's price and average daily trading volume.

33. In or about and between June 9 and June 27, 2017—when the SEC halted trading in EPTI shares—KNOX, acting at the direction of the CC-2 Control Group, sold shares of EPTI from the Silverton omnibus accounts at Brokerages 1 and 3, generating proceeds of approximately $1.3 million.

B. The CURR Pump-and-Dump

34. In or about June 2016, the CC-2 Control Group acquired substantially all of the stock of a publicly traded shell company (the "CURR Public Shell").

35. By September 2016, the CC-2 Control Group transferred its shares in the CURR Public Shell to multiple offshore nominee entities (the "CURR Nominees"), each of which held under 5 percent of the company's total outstanding shares. Each of the CURR Nominees was registered in the name of a third-party beneficial owner with familial or personal connections to the CC-2 Control Group.

36. CC-2, together with others, merged a privately held company, Cure Pharmaceutical Corporation, into the CURR Public Shell. The reverse merger closed on or about November 7, 2016.

37.     Beginning in or about February 2017, the CC-2 Control Group caused approximately three million free-trading shares of CURR stock held in the names of the CURR Nominees to be transferred to Silverton.

38.     KNOX caused the CC-2 Control Group's shares to be deposited into omnibus accounts held by Silverton at multiple brokerage firms. For example:

   a. On or about March 3, 2017, KNOX deposited approximately 1.1 million shares of the CC-2 Control Group's shares into accounts at Brokerage 1;

   b. On or about March 3, 2017, KNOX deposited approximately 982,202 shares of the CC-2 Control Group's shares into accounts at Brokerage 3; and

   c. On or about March 16, 2017, KNOX made an additional deposit of approximately 1 million shares of the CC-2 Control Group's shares into accounts at Brokerage 1.

39.     Beginning in or about late February 2017, CC-2 caused others to engage in manipulative trading of CURR shares, and the company itself released eight successive press releases, prompting a significant increase in the average daily trading volume of CURR shares.

40.     In or about and between March 10 and March 21, 2017, KNOX, acting at the direction of the CC-2 Control Group, sold approximately 147,647 CURR shares from the Silverton omnibus accounts, generating proceeds of approximately $1 million.

   C. The Replacement of the EPTI and CURR Nominees' Beneficial Owners

41.     In or about September 2017, after the SEC halted trading in EPTI shares and began an investigation into suspicious trading in the stock, KNOX met in Switzerland with CC-1 and members of the CC-2 Control Group. At that meeting, KNOX and his co-conspirators decided to replace the beneficial owners of the EPTI and CURR Nominees with new beneficial owners who

lacked personal or familial connections to the CC-2 Control Group, in order to better conceal the identity of the CC-2 Control Group.

42. In or about December 2017, the CC-2 Control Group created alternate beneficial owner forms for the EPTI and CURR Nominees, which were backdated to make it appear as though the new beneficial owners had been in place prior to the initial transfer of EPTI and CURR shares to Silverton.

43. The CC-2 Control Group sent the backdated forms to KNOX and CC-1, who then caused the prior beneficial owner forms to be replaced with the new forms in Silverton's files.

## COUNT ONE
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 371)

44. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 43 of this Indictment and charges that:

45. In or about and between 2013 and October 2018, in the District of Massachusetts and elsewhere, the defendant,

ROGER KNOX,

conspired with CC-1, CC-2 and with others known and unknown to the Grand Jury to commit an offense against the United States, specifically, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, to wit: to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, specifically, various microcap stocks including, but not limited to, shares of EPTI and CURR.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT TWO</u>
Securities Fraud; Aiding and Abetting
(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

46. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 43 of this Indictment as if fully set forth herein, and further charges that:

47. In or about and between June 9, 2017 and June 27, 2017, in the District of Massachusetts and elsewhere, the defendant,

ROGER KNOX,

did knowingly and willfully, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, specifically: shares of EPTI, a microcap stock traded on the OTC market.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; 17, Code of Federal Regulations, Section 240.10b-5; and, Title 18, United States Code, Section 2.

11

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c))

48. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 43 of this Indictment and further alleges that:

49. Upon conviction of the offenses in violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, as set forth in Counts One and Two of this Indictment, the defendant,

## ROGER KNOX,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and any property used in any manner or part, to commit, or to facilitate the commission of, such offenses. The property to be forfeited includes, without limitation, the following assets:

    a. $164,990,495 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

50. If any of the property described in Paragraph 49 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) ), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 49 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY

_____
ERIC S. ROSEN
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS                October 23, 2018

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk
10/23/18 @ 12:13pm