1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2

UNITED STATES OF AMERICA,      :    CRIMINAL ACTION
                                    No. 18-10385-NMG-1

     Plaintiff,               :

          v.                  :

ROGER KNOX,                   :

     Defendant.               :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

          BEFORE THE HONORABLE M. PAGE KELLEY,
          UNITED STATES MAGISTRATE JUDGE
                **DETENTION HEARING**

APPEARANCES:

For the United States          United States Attorney's Office
of America:                    BY:  ERIC S. ROSEN, AUSA
                               1 Courthouse Way, Suite 9200
                               Boston, MA  02210

For the Defendant:             WILLIAM H. CONNOLLY, ESQ.
                               20 Park Plaza, Suite 1000
                               Boston, MA  02210


                               U. S. District Court
                               1 Courthouse Way
                               Boston, Massachusetts  02210
                               Wednesday, October 24, 2018
                               1:23 p.m.

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

_____

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO  80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

1                                INDEX

2

3    EXHIBITS:                                    Marked      Received

4        G-1 thru 7                                  8           8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  -- 24, 2018 and we're on the

3    record in Criminal Case No. 18-10385, the United States of

4    America versus Roger Knox, the Honorable M. Page Kelley

5    presiding.

6              Would counsel please identify themselves for the

7    record?

8              MR. ROSEN:  Good afternoon, your Honor.  Eric Rosen

9    for the Government.

10             THE COURT:  Good afternoon.

11             MR. CONNOLLY:  Good afternoon, your Honor.  Bill

12   Connolly for Roger Knox.

13             THE COURT:  Good afternoon, Mr. Connolly.

14             Good afternoon, Mr. Knox.

15             THE DEFENDANT:  Good afternoon, your Honor.

16             THE COURT:  So we're here for the detention hearing

17   and also arraignment.

18             And is your client ready to be arraigned?

19             MR. CONNOLLY:  I don't think he is at this moment,

20   your Honor.  We've been preparing for detention.  The Court's

21   probably aware, I got appointed recently.

22             THE COURT:  Sure.

23             MR. CONNOLLY:  I've had to dedicate or focus my

24   attention on gathering information for that aspect of the case.

25   If the Court would like to arrange [sic] Mr. Knox, if somebody

1  has a copy of the indictment -- he was indicted yesterday --

2          THE COURT:  Sure.

3          MR. CONNOLLY:  -- I could review it with him either

4  before or after detention and we can certainly do the

5  arraignment today.

6          THE COURT:  Okay.  Why don't we just take a minute and

7  we'll turn off your microphone.

8          MR. CONNOLLY:  Sure.

9          THE COURT:  I certainly understand the time.

10         Sir, it's just to get you, the speedy trial clock

11  running and get you to enter a plea of not guilty today.

12  That's what we're doing.

13         THE DEFENDANT:  Okay.

14         THE COURT:  But why don't you just turn the --

15     (Pause)

16         THE COURT:  -- do you understand in a general way what

17  it is that you're charged with?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  Okay.

20         So I'm going to ask the Government to state the

21  charges and the maximum possible penalties.

22         MR. ROSEN:  Your Honor, he's been charged by a grand

23  jury with two counts.  First is a conspiracy to commit

24  securities fraud, in violation of Title 18, United States Code,

25  Section 371, and the second is securities fraud with -- and --

1   as well as aiding and abetting, in, in violation of Title 15,

2   United States Code, Sections 78j(b), 78f(f), and United States

3   Code, Section 2.

4         The substantive securities fraud count carries up to

5   20 years in prison, 3 years of supervised release, and a fine

6   of $5 million.  And the, the charge of securities -- commit --

7   conspiracy to commit securities fraud provides for a sentence

8   of no greater than five years in prison, three years of

9   supervised release, and a fine of $250,000, or twice the, the

10  gain or loss of the offense.

11        THE COURT:  Okay.  And a hundred dollar special

12  assessment for each count.

13        MR. ROSEN:  That is correct.

14        THE COURT:  Okay.

15        So, sir, if you'll stand up, we'll do the arraignment.

16     (Defendant complies)

17        THE COURTROOM DEPUTY:  Mr. Knox, as to Count 1 of the

18  indictment charging you with conspiracy to commit securities

19  fraud, in violation of Title 18, United States Code, Section

20  371, how do you plead, guilty or not guilty?

21        THE DEFENDANT:  Not guilty.

22        THE COURTROOM DEPUTY:  As to Count 2 of the indictment

23  charging you with securities fraud, in violation of Title 15,

24  United States Code, Sections 78j(b) and 78f(f), and aiding and

25  abetting, in violation of Title 18, United States Code, Section

1    2, how do you plead, guilty or not guilty?

2            THE DEFENDANT:  Not guilty.

3            THE COURTROOM DEPUTY:  Thank you

4            THE COURT:  Okay.  Thank you very much.

5            And let's go ahead now and set the initial status

6    conference.  And how about Monday, December 17th, at 10:20

7    a.m.?

8            MR. ROSEN:  Okay.

9            THE COURT:  How's that for you, Mr. Connolly?

10           MR. CONNOLLY:  Just look at my calendar, your Honor.

11   You say December 17?

12           THE COURT:  Yes.

13           MR. CONNOLLY:  That's fine, your Honor.

14           THE COURT:  Okay.  And do you agree to exclude the

15   time between the date of the indictment on October 23rd to the

16   17th?

17           MR. CONNOLLY:  Yes, your Honor.

18           THE COURT:  Okay.

19           All right.  So what's the status of the detention

20   hearing?

21           MR. ROSEN:  We're prepared to proceed.  I talked to

22   defense counsel.  We're prepared to proceed by proffer today.

23   About the, about the detention, the Government still asks,

24   seeks detention under the relevant statutes of 3142.

25           THE COURT:  Okay.  And for, and just to go over those

 1   one more time, you're moving under risk of flight?

 2              MR. ROSEN:   Both risk of flight and obstruction of

 3   justice, your Honor.

 4              THE COURT:   Okay.

 5              Okay.   So -- and this is not a presumption case.   So

 6   I'll hear you.

 7              MR. ROSEN:   Okay.

 8              Judge, it's the Government's burden to prove by a

 9   preponderance of the evidence a risk of flight.   Here, we

10   believe it's a very clear case.   The defendant has been charged

11   by a grand jury now participating in one of the largest, if not

12   the largest, microcap pump-and-dump securities frauds ever

13   brought in, certainly in this District, but most likely as well

14   as in the United States.   The total set forth in the indictment

15   is about $156 million of which Mr. Knox's cut was 6,

16   approximately 6 percent of gross, gross, gross proceeds.

17              He did so through an entity called Wintercap.

18   Wintercap used to be known as Silverton.   I'll refer to it as

19   Silverton right now, but just for the, so the record is clear,

20   if we look at Government Exhibit 5.   The exhibits, I --

21   sorry --

22              THE COURT:   Oh, okay.

23              MR. ROSEN:   -- the exhibits I provided to the Court

24   and I'll let your Honor get --

25              THE COURT:   Okay.

1     MR. ROSEN:  -- get there.

2     THE COURT:  So are there any objections to the, any of

3  the exhibits, Mr. Connolly?

4     MR. CONNOLLY:  No, your Honor.

5     THE COURT:  And how many of them are there?

6     MR. ROSEN:  Seven.

7     THE COURT:  Okay.  So I'm going to admit these seven

8  exhibits for purposes of the hearing without objection.

9     (Government's Exhibits 1 through 7 admitted in evidence)

10     THE COURT:  Yes.

11     MR. ROSEN:  And this was a -- what Exhibit 5 is, your

12  Honor, is a, sort of a register of shares for Wintercap SA, his

13  purported asset management company in Switzerland, and as you

14  can see, Roger Knox is the, the whole, the whole owner of it, a

15  hundred percent of the total shares.

16     So when we're looking at, at the facts, this isn't,

17  this is not a person who's a low-level person in the

18  conspiracy, maybe he got caught up in something.  He's it, him

19  and a business partner and dozens and dozens of co-conspirators

20  around the world.  He led it, he operated it for years, and he

21  profited from signif, significantly and he, and he hid that

22  money in bank accounts around the world.

23     I think I would, you know, I read the, I read the pre

24  -- the -- the probation's officer report -- and obviously, I, I

25  respect Mrs. Walls tremendously -- but I think what's lacking

1    there in recommending $600,000 surety bond for the defendant is

2    it has nothing to do with the case.  It's essentially an

3    arbitrary number.  It doesn't reflect anything about him, the

4    offense he committed, and the monies he made from this offense.

5         The evidence here is absolutely overwhelming.

6    Obviously, there are documents showing he committed fraud, that

7    he led Silverton, e-mails to that effect, e-mails of him

8    setting up all the brokerage accounts and bank accounts around

9    the world.  We have records and documents of him committing

10   fraud on the brokerages by purporting to lie about the number

11   of shares that he and his, and Silverton/Wintercap owned.  We

12   have text messages of him obstructing justice and engaging in

13   that with co-conspirators.  And most notably, we have a, audio

14   calls between him and, and co-conspirators in which he lays out

15   evidence of the fraud in extreme detail.

16        And most note -- and, and one of the other things,

17   point we have to remember is that we did a lot of search

18   warrants in this case, but none on his, on Mr. Knox's accounts.

19   He has no standing, really, to contest the evidence.

20        So when we're thinking about detention I think it's

21   important to know the Government's ready to proceed.  We have

22   our documents and this isn't going to be two years down the

23   road.  We feel we'd be, you know, ready to present the case in

24   fairly rapid, you know, fairly rapid time for a case of this,

25   of this size.

1         So what's his incentive to flee? Well, I think almost

2 the better option would be what is his incentive to stay? He's

3 facing a base offense level of 7, plus 26 for a loss of $150

4 million or more, potential enhancements for money laundering,

5 leadership, number of victims, fraud committed outside the

6 United States. If he goes to trial, he's looking at Offense

7 Level 41, a criminal history category of 1. That's 30 years.

8 Even if he accepts responsibility, he's still looking at

9 approximately 20 years in prison, a devastatingly, a

10 devastating amount of time for someone like him in his late

11 40s. Essentially, he'll be getting out in his late 60s.

12 There's no incentive at all to stay, let alone, we believe, for

13 $600,000.

14         I found it interesting in the pre-sentence -- in

15 the -- in the probationer's report that he wouldn't tell

16 anything about his assets. In fact, we don't know anything

17 about him after 2013. And that's his right under the Fifth

18 Amendment, but the Government does know something about him

19 from this multi-year investigation into fraud. And I think

20 it's also important to note that "fraud" is a word that really

21 just means lying and we have evidence that he was a liar,

22 someone who cannot be trusted to provide correct information to

23 brokerages, to customers, and to investors who lost over a

24 hundred million dollars. And that's really what his job was.

25         And let's look at Exhibit No. 2 because we have to

1   rationalize what $600,000 will do and one of the parts of the

2   Bail Reform Act shows that the court should decline to accept a

3   collateral, the $600,000, if it will not reasonably assure the

4   appearance of the person as required.  And I'm not taking issue

5   at all with the individuals in Lexington he has, he has chosen

6   to put up his, his collateral.  I have no evidence at all that

7   they've been involved in any criminal activity.  I'm not going

8   to say that, but we have to know what we're dealing with here,

9   what $600,000 will buy us, and it buys us nothing.

10       The chart set forth in Exhibit 2 is an estimate.  It's

11   an estimate of assets based on records received by the

12   Government.  Obviously, some of those are older than others

13   because you can't, you know, we don't have subpoena power over

14   Mauritius and UAE, Switzerland, Canada, but what it does show

15   is that there's an estimate of about $12.259 million in cash

16   and a securities balance of just about 36 million.

17       So I guess the question is this:  Would you stick

18   around for 5, 10 percent of your total assets?  No.  The answer

19   is no.  You would leave and if your friends lost your, their

20   home equity, well, you just wire it to them.  You get someone

21   to drop it off at the door, big bag of cash.  There's no

22   incentive because $600,000 will do nothing to impact his

23   lifestyle or anything else.  Some of this money has been

24   frozen, but I don't control what happens in Mauritius, I don't

25   control what happens in Switzerland, and I don't control what

1  happens in Canada.

2          So I have no assurances that that money will be there

3  and won't be available for his use.

4          THE COURT:  So if I can just ask you.  With regard to

5  Exhibit 2, which says Estimated Assets --

6          MR. ROSEN:  That's -- yes.

7          THE COURT:  -- and it's showing bank accounts in

8  Canada, Malta, Mauritius, Switzerland, the U.S. --

9          MR. ROSEN:  And UAE.

10          THE COURT:  -- and UAE, okay, and you have Last

11  Balance.  When was that, do you know?

12          MR. ROSEN:  Well, they sort of all -- they're all

13  different because it depends when you get the records back, but

14  generally, within the past year.  And what -- and if I could

15  just jump in there for Malta, we've been in communications with

16  them and I believe from my last communications when we were

17  sending out freeze orders that the cash balance was about $3.4

18  million, I believe.  I don't have that record on me, but that

19  was my, that was my, my last notification.

20          THE COURT:  'Cause you're showing here it's 3,600,000,

21  but --

22          MR. ROSEN:  So it -- it would have been -- that's the,

23  the latest, 3.6.  And that's from them within the past two, two

24  weeks.  And attempts were made to move that money, Judge.

25          THE COURT:  When did that happen?

1      MR. ROSEN:  After his arrest.

2      THE COURT:  And do you know who did that?

3      MR. ROSEN:  I believe it was on his direction as the

4  sole -- the sole -- the, the sole owner and operator of the

5  brokerage accounts.

6      THE COURT:  So what's your evidence with regard to

7  that?

8      MR. ROSEN:  Well, I, I'd rather not -- I'd, I'd rather

9  not disclose --

10     THE COURT:  Because he --

11     MR. ROSEN:  I, I'd rather not rely -- rely -- if --

12  that, on that prong at this hearing, but --

13     THE COURT:  Okay.

14     MR. ROSEN:  -- I --

15     THE COURT:  'Cause he, he was trying to get a lawyer,

16  too, right?

17     MR. ROSEN:  He, he was, yeah.  And we're not saying it

18  was done completely illicitly, but what I'm saying is that the

19  -- the -- we believe, you know, from our discussions with Malta

20  that it had -- would have had to -- they wouldn't take

21  direction from anybody but him because his, he was the, the

22  name on the account.

23     THE COURT:  And so you have frozen all of this, these

24  accounts?

25     MR. ROSEN:  What I'd say is we've, we've submitted

1    freeze orders.  They're -- and, and that's why I have no

2    assurances that the countries will freeze, will freeze them

3    because, generally, they have to wait for forfeiture orders,

4    which will come at the end of the case.

5            So my -- what -- it's different than in the U.S. when

6    we have, you know, obviously, seizure warrants.  Countries will

7    do different things.  They'll allow people to get money in

8    violation of freeze orders.  I mean, we're talking about

9    countries like Mauritius, UAE, which I don't, I believe we

10   don't have the freeze orders for them 'cause there's no MLAT

11   agreement with, with the UAE.  I believe so.

12           But it's very difficult with assets hidden abroad in

13   so many different countries to (a) know exactly where his

14   assets are.  As I said, we sort of -- we, we don't know the

15   unknowns that we have, that we, that we don't know.  We don't

16   know which other assets were missing because there's obviously,

17   you know, many different countries and we don't know whether

18   the countries involved will honor our freeze orders until the,

19   you know, the end of the case.

20           THE COURT:  And are -- have these been frozen by you

21   or in the civil matter?

22           MR. ROSEN:  They've been frozen -- the ones that I've,

23   I have frozen have been frozen by MLAT as part of criminal

24   seizure warrants issued here.

25           THE COURT:  And do you think there are other assets

1   that are not listed here?

2        MR. ROSEN:  I'm sure there are, I think.  And, Judge,

3   I'm -- I -- I don't want to, you know, speak out of turn for

4   what, for what I don't know, but I believe that some of the

5   assets were shifted from, fairly recently.  I'm not saying

6   after the arrest, but from the Dubai accounts to other accounts

7   we don't, we don't know about.  And I think that's based on my

8   discussions with others involved in the case.

9        But I'm -- it would be impossible for us to know all

10  of his assets 'cause we're -- the only, the only way we could

11  know that is through MLAT or a MLAT process, which, in some, in

12  some respects, can take a year or more to come back.  So we're

13  -- we're sort of -- we're batting behind this cage of what we

14  know and of course, he didn't provide any information at all

15  to, to Probation.

16       So we have nothing to sort of compare that to and I

17  think that's a, really, a huge factor in, in, in risk of flight

18  because we don't know what he -- what he -- what he owns and

19  what he could provide to people in exchange for helping him,

20  you know, flee across the border into Canada.

21       And I have to note that this case involves control

22  groups, people involved in the fraud in the United States, but

23  it also involves control groups in Mexico and Canada and --

24       THE COURT:  So when you say "control groups," what do

25  you mean by that?

1        MR. ROSEN:  Control groups essentially, if I could

2   back up a second.

3        The way his business worked was a -- a -- an

4   individual or group of individuals would take control of a

5   public shell, a shell company.  They would, they would disguise

6   their ownership of the shell because -- the, the reason for

7   that is because SA, SEC rules and regulations require

8   disclosure if you own a certain percentage of a public company

9   and they also in the context of microcap securities prohibit

10  trading over a very small percentage of the shares on a -- on a

11  -- on a -- on a daily basis.  The, the import of that is

12  obvious, which is to prevent things like pump-and-dump schemes

13  and that type, that type of stuff.

14       So a control group would take control of a, of a

15  public shell, merge it into a private company in a reverse

16  merger, and hide the shares in, generally, offshore nominee

17  entities.  So they'd hide it in the name of a, some random

18  beneficial owner, some guy.  And I have an example of that in

19  the -- in the -- in the -- in the documents here where they

20  chose an individual from Saudi Arabia to be a, be a beneficial

21  owner.  And that's Exhibit 6.

22       So at that point with the shares controlled by

23  these -- by a -- by an individual or team of individuals but

24  hidden in the names of other people -- it's all about deceit

25  and disguise -- they'd move it over into Mr. Knox's platform,

1   the Silverton platform.  And what Mr. Knox would do is he'd

2   absorb it into his own company, Silverton.  They'd change on

3   the form, the transfer agent forms, they'd change it into

4   Silverton or Wintercap names and then Mr. Knox would parcel it

5   out amongst what they call omnibus brokerage, brokerages

6   accounts, all in his name, Silverton name.  The import of that

7   was to further disguise who owned these actual shares.

8           So the shares were still controlled by these control

9   groups, but all of a sudden they're in these omnibus brokerage

10  accounts in Mr. Knox's control, Silverton.  He would sell them.

11  He would direct the trading we've seen in all the chats as part

12  of pump-and-dump schemes.  And then, he faced a problem.  How

13  do you get the money back from these overseas brokerages

14  accounts to the control groups?

15          So they partnered up with a money transfer agency

16  called WB21 and that is, really, based, based in Europe, but

17  they created bank accounts in the United States in the name of

18  Silverton and Wintercap.  So they'd make it appear that the

19  brokerages were transferring funds from Silverton brokerage

20  accounts into Silverton bank accounts, but they weren't.

21  Because the bank accounts were controlled by different people.

22  Once they were in these Silverton bank accounts in the United

23  States, the money would be transferred into bank accounts in

24  the name of WB21 and from there, the money would be laundered

25  back to the control groups.  The whole purpose of that was to

1  disguise the origin and to disguise and to promote the

2  securities fraud.

3          Because at the end of the day, it's about money.  The

4  people who own the stock, the control groups, want to sell the

5  stock.  The only way they can do it is with people like

6  Mr. Knox and at the end of the day, they want their money back

7  and they did that through this -- this -- this -- this system

8  that served no economic purpose whatsoever other than to

9  disguise and deceit the banks.  The banks were, kept calling

10  Mr., Mr. Gastauer, who controlled WB21, asking about these,

11  these money transfers, which are huge, and he would lie to them

12  and he would tell them that they were his own assets as part of

13  his own investment vehicle called Silverton.

14          It's, it's all lies.  It's all about taking something

15  you can't sell, selling it, and getting your money back and the

16  people left holding the bag are investors in the United States,

17  people, a lot of elderly victims, a lot of people who, some

18  people who are simply trying to cash in and cash out with a

19  quick buck, other people who were taken in by their

20  advertisements or promotions or press releases.  The whole

21  thing's a scam.  It's a complete fraud and there are real

22  victims here because of Mr. Knox.

23          THE COURT:  How many victims are there, do you know?

24          MR. ROSEN:  I mean, there would be thousands,

25  thousands of victims.  We, I mean, we've identified a few

1    through the, the two, the two scams identified in the

2    indictment, EPTI and CURR, people who were, who were obviously

3    taken in, but you look at some of the ages of these people and

4    they're generally elderly, elderly victims, some not.  I'm not

5    saying everybody was.

6            But, you know, you get an e-mail, you get a phone

7    call.  There's boiler rooms involved, the whole process, and

8    Mr. Knox wasn't really part of that, but he did do some funding

9    for a lot of the promotions, notably the EPTI one where they

10   sent a million dollars from America, the, the control group, to

11   Mr. Knox, who then funneled it back to the, to the people doing

12   that promotion.  I mean, he was integrally involved.  This

13   wasn't some, a side business.  This was his job and he made a

14   lot, a lot of money, which he hasn't told the Court about.

15           THE COURT:  So are there any other things that were

16   uncovered during the investigation that suggest that he was

17   avoiding apprehension or any such thing?

18           MR. ROSEN:  Absolutely.  And if we could go to Exhibit

19   4, which is a text message exchange between a cooperating

20   witness and Mr. Knox.  They were arranging a meeting in the

21   United States.  And if you go to Page 3 of that, of that

22   exhibit, it's an August 25th text message from Mr. Knox to

23   Milan Patel.  "I'm not sure if you are aware of this case when

24   a layover between Canada and Mexico didn't go to plan."  They

25   were talking about meeting, perhaps, in Canada or Mexico.  Then

1    he links to a press release involving 40 pump-and-dump schemes

2    in secret owner offshore brokerage firms and he says, "For my

3    clients' and my own freedom to operate, it is prudent to make

4    travel plans wisely.  I will, therefore, not route via USA.

5    Either Canada or Mexico are available."  And the next page he

6    says, "To clarify, I am unable to meet you or a client in the

7    U.S.  I'm able to reschedule in September to Mexico or Canada."

8         When Mr. Knox was arrested he told the agents he had

9    wiped his computer.  We have text messages and in a call he has

10   said that he typically erases his phone prior to travel.  This

11   is someone skilled in the art of deception and he simply cannot

12   be trusted.  He was not coming to the U.S.  We were lucky to

13   apprehend a international criminal and we are prepared to move

14   forward swiftly with justice.

15        He has no ties to the United States.  He has no

16   partner that we know of.  He's a UK citizen living in France

17   working in Switzerland out of a -- out of a -- he lives in both

18   France and Switzerland, actually, and works out of a 400-person

19   village in Switzerland.  He is someone who can travel

20   internationally and blend in.  He committed a massive fraud in

21   the United States, but he refused to travel here and I think

22   that pretty much says it all.

23        One of the factors that we're seeking detention on is

24   obstruction of justice.  He -- and the, the factor, I believe,

25   is whether -- is there -- whether there is a serious risk of

1   obstruction of justice.  We don't have to imagine that here

2   because he has already obstructed justice.  It's in the

3   indictment in Paragraphs 41 through 43 and it's in the, I

4   believe it's in the complaint as well.  When the SEC began

5   investigating a pump-and-dump scheme called EPTI in,

6   essentially, June-July of 2017 him, his partner, and two

7   cooperators began talking about replacing these beneficial

8   owner certificates.  So there, so instead of saying the, these

9   assets were owned by Person X, they then decided to make them

10  owned by Person Y.  And they did that because Person X was

11  connected to the control group.  Persons X, Y, and Z were

12  connected to the control group.

13         So they conspired and they agreed and that's set forth

14  not only in calls that we have recorded with multiple people,

15  but it's also set forth -- I'm not going to go through the

16  entire exhibit -- but a group e-mail chain -- sorry -- a group

17  text message chain done over a secured app where it's Exhibit

18  3.  And they talk about there replacing all these beneficial

19  owner forms with different people so that the SEC would be none

20  the wiser when they came to investigate.

21         And I have to note about the, the use of encrypted

22  apps and the use of these bank accounts located in places like

23  Mauritius, places like the UAE, Canada.  He's not Canadian,

24  he's not from Dubai, and he's certainly not from Mauritius.

25  Again, these are done specifically to evade capture and to hide

1    assets that, so that he can get them later.

2              THE COURT:  And what about the encrypted apps?

3              MR. ROSEN:  Well, encrypted apps are used to shield

4    from law enforcement so that law enforcement can't -- they

5    believe law enforcement cannot intercept these in a, in a T3 or

6    something like that.  So they would use a, an app to, to shield

7    those.

8              So we're being faced with a set of circumstances where

9    his lawyer will ask you, say that he can follow the dictates of

10   the Court, that he'll stick around, but his first inclination

11   when faced with court process, the SEC, was to evade, was to

12   destroy, to replace, and to obstruct.  It's the lies.  Those

13   are the lies that we're here.  Those are the lies that he's

14   been charged with.

15             So -- and that pretty much concludes, your Honor, what

16   I, what I want to say, but we balance all of that against a

17   $600,000 equity of someone he's at least, you know, he's

18   visited a couple times in the past, I guess fairly recently,

19   but is that enough?  I mean, that's not enough when faced with

20   essentially spending the rest of your productive life in

21   prison.  It's simply, your Honor, it's, it's, it's my belief --

22   and I think we've proven by the preponderance -- that nothing

23   can, nothing can keep him here.

24             So we respectfully ask for his detention until trial.

25             THE COURT:  Can I just ask you to go through the

1 | exhibits one at a time and make sure I understand what the

2 | purpose of them is?

3 | MR. ROSEN:  Sure.  And I, and I didn't address Exhibit

4 | 1, your Honor.  I, I apologize.

5 | THE COURT:  That's all right.

6 | MR. ROSEN:  But Exhibit 1 is, this was found in his

7 | luggage and this is a Blacklight SA.  This is a business card

8 | where he's a director of and Blacklight SA was, which he's

9 | worked at, I believe -- actually, it says in the, in his

10 | Pretrial report -- he's worked at since, is it 2010?  Yeah.  He

11 | indicated in 2010 he and his former colleagues began their own

12 | asset management company called Blacklight and that's the same

13 | thing as Silverton.  It's a -- it's a pump-and-dump -- it's a

14 | pump-and-dump fraud machine.

15 | So when I say eight years of lying, that's, that's

16 | what it's, that's what it's based on.

17 | Exhibit 2 is the, the estimated assets we have for

18 | him.

19 | Exhibit 3 -- and that, that's a lengthy one so I don't

20 | want to go that, go through too in depth -- but I think if

21 | your, your Honor was to skim it you'll find that what him, the

22 | two cooperators, and the co-conspirator in France were

23 | discussing was the obstruction prong of the case, the

24 | replacement of the beneficial owners from the nominee

25 | shareholders holding stock on behalf of the control group with

1    other people.

2              THE COURT:  And who is Silver Arrow, Arum (phonetic),

3    etc.?

4              MR. ROSEN:  Silver -- Silver Arrow is Mr. Knox and

5    Silver Eagle, I believe, is Richard Tarkett Adams (phonetic),

6    who I think is, who is the, a co-conspirator in this case.

7              THE COURT:  Okay.

8              MR. ROSEN:  Exhibit 4 was your Honor's question about

9    whether he, you know, was trying to evade law enforcement in

10   the United States.  That's a text, text message exchange

11   between him and a, and a cooperator.

12             Exhibit 5 shows his entire ownership of the Wintercap

13   criminal enterprise.

14             Exhibit 6 was also found on Mr. Knox incident to his

15   arrest and again, this is a Form A.  This is a beneficial owner

16   identity and what it shows is that he was using these

17   beneficial owners to hide stock on, on behalf of other people.

18   This one is in the name of someone from Saudi Arabia.

19             So the SEC obviously, if they see it's name, the

20   person's from Saudi Arabia it'll be difficult to contact that

21   person and ascertain whether they truly own Bayview Equities,

22   which is a company from the Marshall Islands.  Mr. Knox and his

23   partner would create these companies in the Marshall Islands

24   and you see on, on, you know, Page 2 like the employer, it says

25   "To be determined, real estate development."  I mean, this is

1  not a, a real, a real person, at least from our records.  We

2  have no indication that this Rami Sakka (phonetic) was ever a

3  client of Silverton.  And you see in his personal net worth

4  it's $5 million, but his annual income is $200,000, nice round

5  number.  This is just, in, in my belief, and I don't -- I don't

6  see them -- I don't, you know, from our investigation we've,

7  we've never come across this person as owning anything used by,

8  by Silverton.

9           And Exhibit 7, the reason I put this in, this is a

10 recent receipt from Delta Hotels in Toronto, Canada where he

11 was before he flew to Mexico and the, the import of that is

12 that, just purely to show that, you know, this is a, an

13 individual paying 600, $700 room, room rate.  This isn't

14 someone, you know -- it's showing he has assets and he's -- and

15 -- which he won't disclose to the Court.  These are very

16 expensive hotels that he stays in for his travel.

17          THE COURT:  So do you have reason to believe that he

18 has other assets just, other than that you, you just don't

19 know?

20          MR. ROSEN:  Well, I -- I -- we've also recovered --

21 yeah.  I mean, yes.  We -- we've, you know, when we searched

22 his -- we did a, you know, search of his bags and wallet as an

23 inventory check.  He, he did have bank, bank cards for other

24 banks that we were not aware of, but -- so the, the point is

25 that it would be impossible for us to know all his assets --

1  and he hasn't disclosed them to the, to the, to the Court --

2  because we have no ability to get documents from these places

3  in any relative ease or quickness.  There's no sort of credit

4  rating bureau we can go to to see what his assets are and we're

5  really, you know, in this context especially, we're relying on

6  disclosure of assets, truthful disclosure and things like that

7  and, and I think what we can, what we can say is that,

8  obviously, that hasn't, hasn't occurred.

9          THE COURT:  And you have two cooperating witnesses?

10          MR. ROSEN:  In -- in the -- in the -- I only want to

11  speak to what's public, your Honor.

12          THE COURT:  I see.

13          MR. ROSEN:  But there are three cooperators set forth

14  in the complaint, coupled with a recording, text messages, and

15  pretty incriminating documents that show direct lies to

16  brokerage houses.

17          THE COURT:  And are you able to sum up what the

18  cooperators have, are telling you?

19          MR. ROSEN:  Sure.  Yes.  I mean, every, everyone has

20  said that Mr. Knox was a fraudster, that they went to him

21  solely to commit fraud and he allowed them to do that.  He knew

22  very well that these stocks were held by control groups, this

23  one located in both the U.S. and in Switzerland.  And it's

24  proven by the fact that no one would ever pay a 6 percent

25  charge to trade securities like this.  I mean, you go to

1   Fidelity you can trade for $5 a, a pop.  No one would ever do

2   that.  The only reason they do that, pay, would pay such a, you

3   know, an, an obscene brokerage fee is because they wouldn't

4   have been able to trade the shares anywhere, anywhere else

5   without an accomplice willing to commit fraud.

6          And I think that's pretty evident from his text

7   message where, "I'm not traveling to the U.S."  He cites the

8   pump-and-dump case and then says, "I'll meet you in Mexico or

9   Canada."  He knew what, he knew what he was doing.  He knew the

10  laws that he were violating and he did that because he made a

11  ton of money, money we don't have access or control of, you

12  know, to the best of our ability at this point and when you

13  weigh that against the $600,000 in equity that they're willing

14  to put up, it's just, in my opinion, it's a, it's a pretty

15  clear call that that would be pennies for him to just get up

16  and walk away and, you know, provide them with the funds some

17  other way.

18         THE COURT:  Okay.  Thank you.

19         Mr. Connolly.

20         MR. CONNOLLY:  Thank you, your Honor.

21         Your Honor, first I'll very briefly respond to some of

22  the Government's arguments and then I will make my pitch about

23  the conditions that I think and Probation believes will

24  reasonably ensure the appearance of Mr. Knox for the case going

25  forward.

1          First, Government's position's understandable, given

2    the nature of the allegations.  Government's been investing

3    the, investigating the case for years, living the case.  It's

4    an instinctive reaction in a case like this with somebody's not

5    a U. S. citizen, with the amount of money involved, the

6    guideline sentencing ranges being calculated by the Government

7    to say that the defendant has to be detained.  He's too big a

8    risk of flight, but the Court has an opportunity to step back.

9    The Court hasn't been living with this investigation and the

10   Court can come at this fresh and look at what's being proposed.

11   And that's really the critical aspect here and I'll get to that

12   last.

13          I would not be arguing to the Court that $600,000

14   pledged by this defendant, given the allegation about his

15   profit and the money involved and the assets, would be adequate

16   to ensure his appearance.  That's ludicrous.  I wouldn't make

17   such a ridiculous argument.  It's a very different context

18   here, given the person who is putting that up and how important

19   that money and how significant that amount of money is to that

20   person and I'll get to that at the end of this argument.

21          The, the Government cites to the, the deception and

22   the lies.  If, if misrepresentations in the course of a scheme

23   to defraud were the, were grounds to detain a defendant, every

24   defendant in every white-collar fraud case would be detained

25   because that's the nature of a fraud case.  The allegations are

1  always that there were misrepresentations, that there were

2  lies.  There's no even presumption of detention in the statute

3  book based on misrepresentations and the reason there's no

4  presumption is because every fraud case involves allegations of

5  deception.

6          The assets moved here, I don't have enough information

7  to directly address the assets, but I do know this and it's

8  clear.  It's, it's on the public record.  In Judge Stearns'

9  session with the SEC cases filed previously retained lawyers

10  filed a motion to use money that was transferred from one

11  account into the attorney's IOLTA account.  It was a

12  substantial amount of money, a retainer fee.  The lawyers were

13  open about the source of those funds and they asked Judge

14  Stearns to carve out that money to be used for the defendant's

15  defense based on the Supreme Court's <u>Lewis</u> case.  The court --

16  at the, at the time those funds were wired in the attorneys

17  weren't aware of the TRO.  They didn't know.  It was sealed at

18  the time.  They didn't know where the funds came from, but

19  there was no attempt to hide those assets.  Clearly, at least

20  with respect to those assets, the movement of some assets, it

21  was an attempt to hire lawyers and, of course, that wasn't done

22  secretly.  That was done with the knowledge of the court.

23          With respect to the guideline sentencing range, the

24  Government has thrown out a calculation, I think, that gets us

25  up to a, a 41 and that sounds terrible, but the reality is in

1    this courthouse where judges are thoughtful and reasoned in

2    implementing sentences -- and I'm not suggesting there's going

3    to be a conviction, but I'm arguing worst case scenario for my

4    client.

5             THE COURT:  Sure.

6             MR. CONNOLLY:  If there is a conviction, when judges

7    weigh massive loss figures with the nature and history of the

8    individual, judges in this courthouse are not sentencing

9    individuals at those ranges.

10            And a perfect example is the TelexFree case.  The

11   Court is probably familiar with it.  The Government touted as,

12   touted it as the biggest Ponzi scheme in Massachusetts history,

13   a $1 billion Ponzi scheme.  The offense level in that case was

14   a 42 and the amount of money involved was, far exceeded the

15   amount of money in this case.  The Government moved for

16   detention in that case.  Ultimately, Judge Hillman said there

17   are conditions that can reasonably ensure the appearance of

18   James Merrill in court.  He released Mr. Merrill on, I believe

19   it was, $900,000.  Some of that money was Merrill's, some of it

20   belonged to friends, and also ordered him, ordered conditions

21   very similar to the conditions being proposed by Probation

22   here.

23            In the Government's argument there opposing release,

24   the Government pointed to a lot of the same things the

25   Government's pointing to here and specifically pointed to all

1   kinds of overseas assets, assets in Brazil, assets that had

2   been moved during the course of the investigation.  This was a

3   case where there was a search warrant executed at TelexFree's

4   headquarters at Marlborough, Massachusetts.  The criminal

5   charges didn't come till much later.

6           So the defendants were aware that the charges were

7   coming.  One of the two owners fled to Brazil.  He's, he's

8   Brazilian.  The American, James Merrill, he stuck around, but

9   before the charges were brought there were massive movements of

10  money from TelexFree's accounts.  The Government pointed to the

11  same thing in arguing for detention there.  Judge Hillman

12  released Mr. Merrill on very stringent conditions.  He went

13  home to his family.  He ultimately showed up in court.  There

14  was a plea.  It was not agreed upon.  It was the Government

15  recommending ten years.  The defendant, I believe, was

16  recommending five.  I believe he ultimately received six, if my

17  memory serves.

18          That's the way the process works here.  Judge Hillman

19  had before him facts about a very serious allegation about a

20  Ponzi scheme that, if believed, constituted a massive, probably

21  the biggest white-collar fraud case in Massachusetts history,

22  but in a well-reasoned decision determined that there were,

23  there were conditions that could reasonably assure that he

24  would return.  He did return.  He complied with all of those

25  conditions and in a case with a guideline sentencing range

1   higher than this case; in fact, worse than this case,

2   Mr. Merrill returned to court, received his sentence, and is

3   doing time right now.  That's how the process works.

4         There are other recent examples of that.  In the case

5   United States v. Ross McLellan, he was a State Street executive

6   con, convicted of executing a fraud involving approximately $19

7   million.  His sentencing range was 12 to 15 years.  He was on

8   release.  That was actually agreed upon.  But with respect to

9   the reasoned sentences they handed down, the guideline range

10  was approximately 12 to 15 years.  The Government recommended a

11  very reasonable sentence of five years and Judge Sorokin, after

12  trial, gave him 18 months.

13        I'm not suggesting that's going to be the sentence

14  here, but I think the Court understands the point, which is in

15  these white-collar fraud cases with big numbers, those numbers

16  may drive the sentencing guidelines, but those numbers don't

17  drive and dictate the ultimate sentence.

18        With respect to the money involved here, the

19  Government argues that $600,000 clearly isn't enough and as I

20  said, it absolutely isn't enough if we're talking about the

21  defendant's money.  A defendant inclined to flee would be more

22  than willing to part with his money.  This is a very different

23  scenario.  What we're proposing here is for this defendant's

24  good friend, David Moore, who's in the court today with his

25  wife, Laurie Ann Moore, they're offering $600,000 of equity in

1   their home.  They do not have a $50 million trust fund.

2   They're hard-working individuals.  I would call them

3   successful, but $500,000 to them is substantial and it's

4   significant.  It's meaningful.  That would amount to the

5   college educations of their two children.  They have a, a son

6   12 and a daughter 13.  That money means a lot to them.

7          The Court is, of course, free to inquire of David

8   Moore and I would actually invite the Court to and, and

9   recommend to the Court that you inquire of David Moore because

10  I think the request here to release the defendant all comes

11  down to this Court's trust in Mr. Moore.  Because what

12  Mr. Moore is offering is to put up substantial equity in his

13  home.

14         And in, in the interest of full disclosure to the

15  Court, it's not the full equity and the only reason for that is

16  the Moores have purchased a second home in Lexington where they

17  live now and when they pur -- they've already -- they're

18  already on P&S.  When they purchase that home they can't have

19  all of the equity in their home tied up.  Once they move into

20  the new home, they'll be willing to put up, potentially, more

21  equity.  But that's the amount they can put up now that's not

22  going to preclude them from moving forward with a sale that

23  they're already on P&S for.  So they can't undo that sale.

24         They're also offering to have Mr. Knox live in their

25  home.  I have had discussions with them.  I have been very

1   careful to advise them of what a significant undertaking it is.

2   I didn't just simply ask, "Can he live at your house?"  I told

3   them, "He would likely be on electronic monitoring.  This isn't

4   something that's going to last a month.  This case could last a

5   year.  It could last a year and a half and as time goes on this

6   type of arrangement can become more stressful and you need to

7   understand that if you're willing to undertake this.  In

8   addition, you'll be obligated to the Court to report any

9   violation of conditions by this defendant."  They are fully

10  aware of what their responsibility is and they're willing to

11  undertake that responsibility for Mr. Knox.

12          They also know the severity of the charges.  They've

13  read the criminal complaint.  They know what type of money is

14  involved.  I talked to them about what the Government believes

15  the sentencing guideline range is.  They're fully aware.

16          So they're not third-party custodians offering equity

17  who have a complete misunderstanding of the severity of these

18  charges and the seriousness of the potential punishment.  They

19  are fully aware, but that is the trust they have in Mr. Knox

20  with respect to their relationship.  David Moore is a man of

21  impeccable character.  He's a United States citizen, originally

22  from Northern Ireland.  He met Mr. Knox at university.  He has

23  been married for 17 years.  His wife, Laurie Ann, went to the

24  University of Illinois, the MIT Sloan School of Management.

25  They're both employed.  I'm happy to relay the, the employers,

1    if you'd like.  I'd prefer not to on the record if I don't have

2    to.  These are people of high integrity, high character.  They

3    are not going to violate their obligation to this Court.

4              That's the significant piece here.  I would not be

5    arguing to this Court that you release this defendant under

6    these allegations on his own $600,000 pledge.  That would be

7    absurd, but we don't -- when we're talking about a third-party

8    custodian who's willing to take responsibility for effect,

9    essentially, supervising the defendant it's, it's what it means

10   to that person.  It's not what $600,000 means to this

11   defendant.

12             With respect to the Government's contention that it

13   would be easy for this defendant to access money, move money,

14   and then use those assets to reimburse Mr. Moore, that's not

15   going to happen.  Mr. Moore -- you can speak to him --

16   Mr. Moore is not going to accept a nickel from this defendant.

17   If this defendant attempts to violate any conditions, if he's

18   not home at curfew, Mr. Moore is going to call Probation

19   immediately.  Mr. Moore is that supremely confident that the,

20   this defendant, whatever allegation of violations of trust

21   exist in this case, Mr. Moore is supremely confident he is not

22   going to violate Mr. Moore's trust and if he violates

23   Mr. Moore's trust, Mr. Moore will be outraged, outraged and he

24   will be the first person to notify this Court.  That is a

25   substantial, substantial offer, your Honor, and it's different

1 | than pledging property belonging to this defendant.

2 | Related, relatedly, the defendant also has a

3 | girlfriend who lives in the same neighborhood as the Moores,

4 | three blocks away.  They were introduced through the Moores.

5 | She lives nearby as well.  She's another added layer of

6 | security because she, too, will be keeping an eye on the

7 | defendant.  She won't have the same responsibility, but she

8 | will understand the obligations of the Moores and as a close

9 | personal friend of the Moores, if she gets any inkling that

10 | this defendant is violating a condition, she is going to report

11 | that to the Moores who are going to report it to the Court.

12 | Your Honor, the bottom line is that whatever

13 | allegations exist in this case about money, misrepresentations,

14 | wiping of computers, it's a different scenario now.  He's, he's

15 | in front of a court.  Conditions are going to be imposed on him

16 | and he is going to be under the watch not only of this Court,

17 | but also of his closest friend who's not going to take a

18 | chance.  So those conditions are going to ensure that this

19 | defendant doesn't flee, similar to James Merrill in the

20 | TelexFree case.

21 | This Court may not recall, but this Court had a

22 | somewhat similar case to this, a pump-and-dump scheme, with a

23 | defendant named Jehu Hand.  Ultimately, an agreement was worked

24 | out to release him.  Initially, the Government objected.  He's

25 | an individual, he's an American citizen, but prior to this case

1 when he was aware there's some investigation he was traveling

2 all over the world, everywhere but the United States, and he

3 got caught attempting to make one entry into the United States.

4 That's somewhat similar to the allegations the Government's

5 making about this defendant.

6 He was released in this session on conditions,

7 including his own pledge of, of assets, not the pledge of a

8 friend, and not in Massachusetts. He returned to California

9 and he was on electronic monitoring in his own apartment in

10 California. Mr. Hand didn't violate any conditions. He abided

11 by this Court's conditions. He returned to court for trial.

12 He's convicted and now he's facing sentencing. That is the

13 process. Mr. Hand was available to his lawyers to assist in

14 their defense the way Mr. Merrill was available to his lawyers

15 and given that we have conditions that can absolutely ensure

16 that this defendant is not going anywhere, this defendant

17 should be permitted to be on release. He'll effectively be on,

18 in confinement with the exception of some appointments to go

19 to, except he won't be in a jail. He'll be in confinement,

20 though, but he'll be in a position to work with his lawyers in

21 what is a very, very complex case with what's going to involve,

22 I imagine, an unusually large amount of discovery. Him being

23 locked up in this situation is going to make it very difficult

24 for him to work with his lawyers.

25 That, in and of itself, of course, is not a reason to

1   release a defendant, but it's just another layer here.  Given

2   what we have proposed, agreed to by Probation, I suggest there

3   are conditions that can ensure that he will return.

4           I offer Mr. Moore, if you would like to speak to

5   Mr. Moore about his obligations if the Court's willing to

6   release the defendant.

7           Lastly, if the Court's willing to release the

8   defendant on those conditions, we, of course, would have -- I

9   have, I have an appraisal available for the Court.  I think the

10  Court will probably want a title search done to show the clean

11  title.  We will prepare the documents for the clerk's office,

12  the deed, the mortgage.  Everything will be done the right way.

13  That may take a few days, but it will be done the right way.

14           THE COURT:  Anything else, Mr. Rosen?

15           MR. ROSEN:  Yes, very, very briefly.

16           You know, your Honor, I don't, I don't doubt that the

17  Moores, you know, in, intend, but we're talking about a

18  defendant with millions of dollars who's putting up nothing on

19  his own, not a single penny.  He would, he would lose nothing

20  if he was -- if he -- if he simply fled.  And, and, you know,

21  the fact is that these, the, the Moores, both Mr. and

22  Mrs. Moore, they both work fulltime and there would be no one

23  monitoring him during the day, absolutely no one.

24           So he'd be left, essentially, with free rein to do

25  what, whatever he wants.  Obviously, he could cut his bracelet

1  and flee.  That happens all the time.  I think the big

2  difference between the, the cases that defense counsel talked

3  about and this case is that in those cases all the defendants

4  had significant ties to the (a) the United States.  They were

5  United States citizens, but (b) there were ties to their home

6  area like, like McLellan and, I believe, Merrill as well.

7          So it's not -- it's not the -- it's not the same

8  thing.  And also, I'd note I believe in those cases -- I'm, I'm

9  not a hundred percent positive -- that the defendants were

10  upfront about their assets and, and, and things like that.

11  And, you know, Mr. McLellan worked at State Street and he had

12  legitimate income and the fraud was a, a, a smaller part of

13  that.  Here, Mr. Knox's entire job for at least the past 8

14  years was heading a massive fraudulent empire.

15          So the -- we're talking about apples and oranges and

16  we're talking about a defendant who won't put up a cent and

17  that $600,000 is something that he could repay in a second.  So

18  there, there's no incentive for him to stay and I think it's

19  pretty, pretty evident that he'll just flee.

20          THE COURT:  Okay.

21          MR. CONNOLLY:  Your Honor, I, I don't want to -- I'm

22  not going to --

23          THE COURT:  No.  Go right ahead.

24          MR. CONNOLLY:  -- respond to everything.

25          I just want to point out that with respect to the

1   assets, that's, that's his, his lawyer's advice because of the

2   allegations in this case and the SEC's case.  That's my advice

3   to Mr. Knox that we not talk about his assets right now.  It

4   doesn't mean that we may not talk about them later.  He's not

5   in a position to talk about his assets right now, given the

6   allegations.  That -- that's -- that -- I think that's clear to

7   the Court.

8               THE COURT:  Okay.

9               I -- I -- I mean, I will just say it does pose a bit

10  of a conundrum.  I think if I'm supposed to be evaluating

11  someone's ability to flee, which I think requires a lot of

12  assets in this day and age, and evade arrest, then it's

13  difficult to do that if you don't know someone's assets.  I do

14  understand having many more assets than the Government already

15  knows about could wind up incriminating him, too.  So I think

16  that, that's just, is what it is.

17              So I do, I do just want to say to Mr. Moore and your

18  wife, thank you very much and, for being here.  I feel like

19  Probation has already, Ms. Walls, has already spoken to you and

20  she memorialized what you said quite well.

21              Yes, sir?

22              MR. MOORE:  Could I, could I just correct, correct

23  some things?

24              THE COURT:  Yes.  Go right ahead.

25              MR. MOORE:  I, and I know the gentleman here, he's

1    just doing his job, but he, he insinuated that I would accept a

2    bag of cash on my front step.  I, I'm not -- totally wrong.

3    And I think I've already mentioned that to Mr. Connolly.  I --

4    I'd be -- I would be calling him or whoever else, probation

5    office, whoever else that needs to be.  We're not in it for

6    this.  We've been in Lexington 17 years.  We have a lot of

7    friends in the town.  This is not going to happen.

8              THE COURT:  Sure.

9              MR. MOORE:  The next thing is he says that we're not

10   in the house during the day.  I, I can work from home, if I

11   need to.  I normally would be there.  I, I do travel for

12   business and we can make plans.  We both flex the job .  We

13   feel very fortunate for that.  I just want to make sure that

14   that's clear.  Don't make a substance about where I go to work.

15   And I do work in Westborough.  I work in Lexington.  I'm, I'm

16   home (indiscernible) day so I can work, I can work anywhere.

17             And I also use a lot of apps.  I use WhatsApp, I use

18   Facebook Messenger, I use Apple iMessage for my family, for my

19   work, and I believe they're considered secured apps.  Also, I

20   work in telecom so that doesn't mean we all don't use those

21   apps in our daily lives.  They're free to talk to our friends

22   internationally.  That's what -- most people in the world are

23   using WhatsApp.  It's one of the biggest apps in the world and

24   that's just from my, my day job experience.

25             And, and it's, it's insinuated that I might be, you

1   know, doing something wrong if I use WhatsApp because it's a

2   secured app.  Every time you change your phone it tells you

3   you're using a secured app and, and it just happens to be free

4   and it, it's a way of not paying, you know, exorbitant text

5   messaging fees.

6            And Roger has visited us many times, not just a couple

7   of times.  We met in Michigan in '96.  He was our first

8   visitor.  He's one of my longest friends.  I've known him for

9   nearly 30 years and when we had no money in college and, and

10  we're eating (indiscernible) every, every night.  And he's one

11  of my longest friends and, you know, money is, is not, in this

12  situation it's just, this discussion (indiscernible) of money,

13  but there's things that are bigger than that.  He has the same

14  birthday as our daughter.  He's practically a godparent to our

15  children.  He has -- we have spent more time on vacations with

16  Roger visiting us or us visiting Roger than my blood relatives

17  and certainly Laurie Ann's relatives.

18           And so there's a, there's a huge connection there in

19  that we were part of a Northern Ireland contingent that ended

20  up going to the university in Scotland together.  And we have

21  friends who were here last week who were very, you know,

22  wishing they could see Roger.  We know they couldn't 'cause of

23  the, the time it takes.  We've got friends, mutual friends that

24  are visiting us for Christmas, which would be another incentive

25  to stay, and can spend Christmas with them.  We were actually

1   actively hoping we could do that if we're back in, you know,

2   Christmas at our house.  (Indiscernible) we were, we were

3   talking about it.

4            So I know I'm going on and I don't mean to, I don't

5   mean to take up the Court's time, but I just wanted to correct

6   some of those things and, you know, let you hear my voice.  And

7   I travel on business and I stay in hotels that are worth

8   hundreds of dollars and that's just the nature of the world

9   we're in.

10           And I just, I just don't want anything put on me that

11  I might be accepting a bag of cash.  We will be absolutely

12  inconvenienced as far as kids' college fees.  It is -- is -- if

13  there wasn't a crazy circumstance that happened, if this was --

14  the money we're putting up is equity in our house.  It's, that,

15  that's not going to be easy for us and we want to have as much

16  skin in the game as we can to show that we'll do everything the

17  Court needs us to.

18           And we had a very long conversation last night, which

19  I really appreciate.  Thank you very much for taking the time

20  to tell us and, and, and spend time with me on the phone.

21           And, and if there's anything else I can help, I, I

22  just wanted to make sure that's heard.

23           THE COURT:  Okay.  Thank you very much.

24           Anything else, Mr. Rosen?

25           MR. ROSEN:  I think the, his, his own words, the text

 1   messages say it all.  "For my clients' and my own freedom to

 2   operate, it is prudent to make travel plans wisely.  I will,

 3   therefore, not route via USA.  Either Canada or Mexico are

 4   available."

 5          And I'm not taking issue with Mr. Moore.  He can say

 6   what he wants to say.  It does say in the report that he main,

 7   you know, he maintains employment in Westborough and his, his

 8   wife is in Burlington.  I wasn't trying to insinuate otherwise,

 9   that he works from home, but he's known him for a long time.

10   Did he know -- and, I mean, I don't -- what did he tell him

11   that he did for work?  I mean, he's been involved -- this is a

12   massive, massive case involving his essential job.  And so if

13   he -- it's only a deception of investors and people who are

14   losing large quantities of their own assets so that someone

15   could stay in nice hotels.  But, I mean, what did -- he

16   obviously didn't tell Mr. Moore the truth, too.

17          So I think that should be taken to, into account.

18          THE COURT:  Okay.

19          I, I really appreciate you speaking up, Mr. Moore.

20          So I'm going to take this under advisement.  I'm, I

21   need to look at Probation's report.  I'm going to talk to

22   Probation some more and I'm going to study the Government's

23   exhibits, which are voluminous and I haven't really had a

24   chance to look at them.

25          And what this means is that I'm just not making a

1   decision right now and I'll try to make a decision within the

2   next few days.  I won't try -- I'll try not to let it drag on.

3          In the meantime, if either party has anything further

4   to submit that would be helpful, I'm happy for you to do that.

5   I just ask you, if you decide to do that, to let Kellyann

6   Belmont know so that I don't make a decision without getting

7   your materials. And -- so I'll wait for them, in other words.

8          So okay.  Anything else at this time?

9          MR. ROSEN:  No, your Honor.

10          THE COURT:  Okay.

11          All right.  Thank you --

12      (Proceedings at 2:34 p.m.)

13

14

15                         CERTIFICATE

16          I, court approved transcriber, certify that the

17   foregoing is a correct transcript from the official electronic

18   sound recording of the proceedings in the above-entitled

19   matter.

20   /s/ *Janice Russell*                    February 15, 2019

21   Janice Russell, Transcriber                    Date

22

23

24

25